E-FILED
Thursday, 26 September, 2024  01:51:44 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT A

## IN THE CIRCUIT COURT OF THE FOURTEENTH JUDICIAL CIRCUIT ROCK ISLAND COUNTY, ILLINOIS

| | |
|---|---|
| Donna Deufel | |
| | **Case**  2024LA93 |
| Plaintiff, | |
| v. | |
| 3M Company, a Delaware Corporation, | |
| Defendant. | |

### COMPLAINT

NOW COMES Plaintiff, Donna Deufel ("Donna"), by and through her attorney, Jeffrey J. Neppl of The Neppl Law Group, and seeks to hold Defendant 3M Company ("3M" or "Defendant") liable for its operation of, and related negligent conduct at, its Cordova facility in Rock Island County, Illinois ("Cordova Facility") and its discharge, emission, placement, disposal, leakage, spillage, and/or abandonment of perfluoroalkyl and polyfluoroalkyl substances ("PFAS") from the Cordova Facility.

Donna brings this civil action to: (1) hold 3M liable for monetary damages for the health conditions she has developed due to her exposure to the resulting contamination; (2) obtain monetary damages for the diminution in her property's value as a result of the contamination 3M has caused from the PFAS released from the Cordova Facility; (3) recover monetary damages for the loss of use and enjoyment of her property resulting from the PFAS contamination described herein; and (4) obtain any other equitable relief as appropriate.

For her Complaint, Plaintiff pleads as follows:

## INTRODUCTION AND NATURE OF THE ACTION

1.  Plaintiff is an owner of 21313 River Road North Cordova, IL located within Rock
    Island County, Illinois

2.  Plaintiff was notified in June of 2022 by 3M that they were mandated to test for
    the presence of PFAS in her private drinking water well as part of their agreement
    with the EPA due to their known discharge, emissions, placement, disposal,
    leakage, spillage, and/or abandonment of PFAS from the Cordova Facility.

3.  Plaintiff learned that her well tested positive in August of 2022 and confirmatory
    testing results were then done to ensure that this was an accurate and positive test
    which took place in December of 2022. This test confirmed the presence of PFAS
    in her well.

4.  Plaintiff was diagnosed with Moderately Differentiated Adenocarcinoma of the
    Sigmoid Colon in July of 2022, which can be related to her continued exposure to
    the PFAS in her well from activities of daily living such as showering, doing
    laundry in the water which contaminated the clothing, swimming in her pool,
    soaking in her hot tub, drinking the water, cooking with the water, growing
    vegetables that were irrigated with the water which in turn were then
    contaminated as well.

5.  Illinois, with a population of approximately 12.67 million people, is the sixth- largest
    state, by population, in the United States.

6.  Nearly the entirety of Illinois' western boundary is the Mississippi River, with the
    few exceptions being where the Mississippi River has changed course over time.

COPY

7.     The Mississippi River watershed is the fourth largest in the world, with an area of approximately 1.2 million square miles.

8.     Illinois has established itself as a leader in protecting the environment and in identifying, monitoring, and addressing contamination caused by PFAS in Illinois.

9.     The Illinois Environmental Protection Agency ("Illinois EPA") is an administrative agency of the State of Illinois, created pursuant to Section 4 of the Act, 4I 5 ILCS 5/4 (2020), and charged, *inter alia,* with the duty of enforcing the Act. The Illinois EPA is further charged with the duty to abate violations of the National Pollutant Discharge Elimination System ("NPDES") permit program under Section 402(b)(7) of the Federal Clean Water Act ("CWA"), 33 U.S.C. § 1342(b)(7).

10.     The Illinois Department of Natural Resources ("IDNR") is an administrative agency of the State of Illinois, created by Section 1-5 of the Illinois Department of Natural Resources Act, 20 ILCS 801/1-5 (2020), and charged, *inter alia,* with the duty of enforcing the Fish and Aquatic Life Code ("Fish Code"), 515 ILCS 5/5-5 (2020), and the Wildlife Code, 520 ILCS 5/1-10 (2020) ("Wildlife Code").

11.     The Illinois EPA and IDNR are the State of Illinois Natural Resource Trustees.

12.     PFAS are a group of synthetic chemicals that do not occur naturally in the

COPY

environment and have been in use since the 1940s.[1]

13.    PFAS are toxic, human-made chemicals that are harmful to the public health, safety,

welfare, and to the environment.

14.    For purposes of this Complaint, "PFAS" shall include, but not be limited to, the

following compounds:

| Acronym | PFAS Analyte Name | Chemical Abstract Services Registry Number ("CASRN") | Formula |
|---------|-------------------|------------------------------------------------------|---------|
| Perfluoroalkyl Carboxylic Acids ("PFCAs") | | | |
| PFTeDA | Perfluorotetradecanoic acid | 376-06-7 | C14HF21O2 |
| | Perfluorotetradecanoate | 365971-87-5 | C14f21Of |
| PFTrDA | Perfluorotridecanoic acid | 72629-94-8 | C13HF2sO2 |
| | Perfluorotridecanoate | 862374-87-6 | C13fisOf |
| PFDoA | Perfluorododecanoic acid | 307-55-1 | C12HFnO2 |
| | Perfluorododecanoate | 171978-95-3 | C12FnO2- |
| PFUnA | Peifluoroundecanoic acid | 2058-94-8 | C11HF21O2 |
| | Perfluoroundecanoate | 196859-54-8 | C11F21Of |

[1] *EPA 's Per- and Polyfluoroalkyl Substances (PFAS) Action Plan,* U.S. EPA (Feb. 2019) at I, https://www.epa.gov/sites/defauJt!files/2019-02/documents/pfasaction plan 021319 508compliant I.pelf; *PFAS Strategic Roadmap: EPA's Commitment to Action 2021-2024,* U.S. EPA (Oct. 2021) at 5, https://www.epa.gov/svstem/files/documents/2021-I 0/pfas-roadmap final-508.pdf; *An Overview of Perjluoroalkyl and Polyfl,uoroalkyl Substances and interim Guidance,* CENTERS FOR DISEASE CONTROL AND PREVENTION (May 7, 2018) at 1, https://stacks.cdc.gov/vicw/cdc/77114.

COPY

| PFDA | Perfluorodecanoic acid | 335-76-2 | C10HF19O2 |
|---|---|---|---|
| | Perfluorodecanoate | 73829-36-4 | C10F19O2- |
| PFNA | Perfluorononanoic acid | 375-95-1 | *C9HF1102* |
| | Perfluorononanoate | 72007-68-2 · | C9F11O2- |
| PFOA | Perfluorooctanoic acid | 335-67-1 | CsHF1sO2 |
| | Perfluorooctanoate | 45285-51-6 | CsF1sO2- |
| PFHpA | Perfluoroheptanoic acid | 375-85-9 | *C1HF1302* |
| | Perfluoroheptanoate | 120885-29-2 | *C1F* 1302- |
| PFHxA | Perfluorohexanoic acid | 307-24-4 | CGHF11O2 |
| | Perfluorohexanoate | 92612-52-7 | CGF11O2- |
| PFPeA | Perfluoropentanoic acid | 2706-90-3 | CsHF9O2 |
| | Perfluoropentanoate | 45167-47-3 | CsF9Of |
| PFBA | Perfluorobutanoic acid | 375-22-4 | *C4HF102* |
| | Perfluorobutanoate | 45048-62-2 | *C4F102-* |
| PFPrA | Perfluoropropionic acid | 422-64-0 | C3HFsO2 |
| | Perfluoropropionate | 44864-55-3 | C3FsO2- |
| TFA | Trifluoroacetic acid | 76-05-1 | C2HF3O2 |
| | Trifluoroacetate | 14477-72-6 | . C2F3O2- |
| Perfluoroalkyl Sulfonic Acids ("PFSAs") | | | |
| PFOS (B,L) | Perfluorooctanesulfonic acid | 1763-23-1 | CsF11SO3H |
| | Perfluorooctanesulfonate | 45298-90-6 | CsF11SO3- |
| PFHpS | Perfluoroheptanesulfonic acid | 375-92-8 | C1F1sSO3H |
| | Perfluoroheptanesulfonate | 146689-46-5 | *C1F1sS03-* |

COPY

| PFHxS (B,L) | Perfluorohexanesulfonic acid | 355-46-4 | C6F13S03H |
|---|---|---|---|
| | Perfluorohexanesulfonate | 108427-53-8 | C&f 13SQ3- |
| PFPeS | **Perfluropropanesulfonic acid** | 2706-91-4 | CsHF1103S |
| | Perfluropropanesulfonate | 175905-36-9 | CsF1103S- |
| PFBS | Perfluorobutanesulfonic acid | 375-73-5 | C4f9S03H |
| | Perfluorobutanesulfonate | 45187-15-3 | C4f9SOf |
| PFPrS | Perfluoropropanesulfonic acid | 423-41-6 | C3HF103S |
| | Perfluoropropanesulfonate | 110676-15-8 | C3F103S- |
| PFES | Perfluoroethanesulfonic acid | 354-88-1 | C4f9Q4SH |
| | **Perfluoroethanesulfonate** | 108410-37-3 | C4f9Q4S- |
| TFMS | Trifluoromethanesulfonic acid | 1493-13-6 | CF3S03H |
| | Trifluoromethanesulfonate | 37181-39-8 | CF3SQ3- |
| Fluorotelomer sulfonic acids | | | |
| 4:2 FTS | 4:2 Fluorotelomer sulfonic acid | 757124-72-4 | C&Hsf9Q3S |
| | 4:2 Fluorotelomer sulfonate | 414911-30-1 | C6H4F9Q3S- |
| 6:2 FTS | 6:2 Flurotelomer sulfonic acid | 82711-15-7 | CsHsF13Q3S |
| | 6:2 Fluorotelomer sulfonate | 425670-75-3 | CsH4F13Q3S- |
| 8:2 FTS | 8:2 Flurotelomer sulfonic acid | 39108-34-4 | C10Hsf17Q3S |
| | 8:2 Fluorotelomer sulfonate | **39108-34-4-** | C10H4f17Q3S- |
| 10:2 FTS | 10:2 Flurotelomer sulfonic acid | 120226-60-0 | C12HsF2103S |
| | 10:2 Fluorotelomer sulfonate | -- | C12H4f2103s- |

COPY

| Perfluoroalkane Sulfonamides ("FASAs") | | | |
|---|---|---|---|
| PFBSA<br><br>FBSA | Perfluorobutanesulfonamide | 1910057-70-3 | C6H3f9NO4S |
| PFOSA<br><br>FOSA | Perfluorooctanesulfonamide | 754-91-6 | CsH2F11NO2S |
| FBSAA | Perfluorobutane sulfonamide acetic acid | 347872-22-4 | CGH4f9NO4S |
| NEtFOSAA | N-ethyl perfluorooctanesulfonamidoacetic acid | 2991-50-6 | C10HGF11NO2S |
| NMeFOSAA | N-methyl perfluorooctanesulfonamidoacetic acid | 2355-31-9 | C11H6F11NO4S |
| EtFOSE | 2-(N-ethylperfluoro-1-octanesulfonamido)- ethanol | 1691-99-2 | C12H10F11NO3S |
| MeFOSE | 2-(N-methylperfluoro-1-octanesulfonamido)- ethanol | 24448-09-7 | C11HsF11NO3S |
| FBSEE diol | Nonafluoro-N,N-bis(2-hydroxyethyl)butane-1- sulfonamide | 34455-00-0 | C1H10F9NO4S |
| HFBSE alcohol<br><br>FBSE | Nonafluoro-N-(2-hydroxyethyl)butane-I-sulfonamide | 34454-99-4 | CGH6F9NO3S |
| HQ-115 | Bis(trifluoi.-omethylsulfonyl)amine | 82113-65-3 | C2F6NO4S2H |
| PBSA | Perfluorobutane-N-(3-(dimethylamino)propyl)-1-sulfonamide sulfonamido amine | 68555-77-1 | C9H13F9N2O2S |
| PBSA-Cl | 3-{[3-Dimethylamino)propyl](nonafluorobutane-1-sulfony l)amino}propanoic acid | 172616-04-5 | C12H11f9Q4N2S |

COPY

| Per- and Polyfluoroalkyl Ether Carboxylic Acids | | | |
|---|---|---|---|
| HFPO-DA (GenX acid) | 2,3,3,3-tetrafluoro-2-(heptafluoropropoxy)propanoic acid | 13252-13-6 | CGHF11O3 |
| | 2,3,3,3-tetrafluoro-2-(heptafluoropropoxy)propanate | -- | Cc,F11O:i- |
| DONA (ADONA acid) | 4,8-dioxa-3h-perfluorononanoic acid | 1919005-14-4 | C10H11N4NaOsS |
| | 4,8-dioxa-3h-perfluorononanoate | -- | C10H10N4NaOss- |
| PFECAA | Butanoic acid, 2,2,3,3,4,4-hexafluoro-4-(trifluoromethoxy)- | 863090-89-5 | CsHF9O3 |
| | 2,2,3,3,4,4-hexafluoro-4-(trifluoromethoxy)-butanoate | -- | Csf903- |
| PFECAB | Acetic Acid, 2,2-drfluoro-2-[1,1,2,2-tetrafluoro-2-(trifluoromethoxy)ethoxy]- | 151772-58-6 | CsHF9O4 |
| | 2,2-difluoro-2-[1,1,2,2- tetrafluoro-2-(trifluorornethoxy)ethoxy]-acetate | -- | CsF9O4- |
| PFECAF (PMPA) | Perfluoro(4-rnethoxybutanoic acid) | 863090-89-5 | CsHF9O3 |
| | Perfluoro(4-methoxybutanoate) | -- | CsF9Of |
| PFECAG | Butanoic acid, 2,2,3,3,4,4-hexafluoro-4-[1,2,2,2-tetrafluoro-l-(trifluoromethyl)ethoxy]- | 801212-59-9 | C1HF13O3 |
| | 2,2,3,3,4,4-hexafluoro-4- [1,2,2,2-tetrafluoro-1- (trifluoromethyl)ethoxy]-butanoate | -- | C1Fu03- |
| PFEESA | Perfluoro(2-ethoxyethane)sulfonic acid | 113507-82-7 | C4Hf9O4S |
| | Perfluoro(2-ethoxyethane)sulfonate | -- | C4F9O4S- |
| PFESA BP 1 | Perfluoro-3,6-dioxa-4-methyl-7-octene-1-sulfonic acid | 29311-67-9 | C1HF13OsS |

COPY

| | Perfluoro-3,6-dioxa-4-methyl-7-octene-1-sulfonate | -- | *C1F130ss-* |
|---|---|---|---|
| | F-538 | | |
| 11Cl-PF3OUdS | 11-chloroeicosafluoro-3-oxaundecane-1-sulfonic acid | 763051-92-9 | C10HF20ClSO4 |
| 9Cl-PF3ONS | 9-chlorohexadecafluoro-3-oxanone-l-sulfonic acid | 756426-58-1 | CsHF 1GClSO4 |
| | Miscellaneous | | |
| Bisphenol AF | 4,4'-(Hexafluoroisopropylidene) diphenol | 1478-61-1 | C1sH10FGO2 |
| PFBSi | Perfluorobutanesulfinic Acid | 34642-43-8 | C4HF9O2S |

This definition also includes any other PFAS that have been, or which are being, discharged, emitted, placed, disposed of, leaked, spilled, and/or abandoned from the Cordova Facility, even if not listed above.

15.     PFAS, as defined in this Complaint, do *not* include any PFAS that have contaminated Illinois' environment or natural resources from aqueous film-forming foams ("AFFF") containing PFOA, PFOS, or any other PFAS compound.

16.     3M has discharged, emitted, placed, disposed of, leaked, spilled, and/or abandoned PFAS and PFAS-containing products at and from its Cordova Facility in such a manner that caused releases of PFAS into the environment at concentrations which are injurious to public health and welfare and to the environment, which cause or tend to cause pollution in the State of Illinois, and which damage to the State's natural resources.

17.     Article XI of the Illinois Constitution, Ill. Const. Article XI, Section 2, provides that, "[e]ach person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to

reasonable limitation and regulation as the General Assembly may provide by law."

18.     As outlined below, Plaintiff brings this action against 3M pursuant to the Illinois Environmental Protection Act ("the Act") 415 ILCS 5/1, *et seq.* (2020); the Illinois Department of Natural Resources Act ("DNR Act") 20 ILCS 801/1, *et seq.* (2020); and Illinois' laws of negligence, trespass, public nuisance, and unjust enrichment.

## PARTIES

### *Plaintiff*

19.     Plaintiff is Donna Deufel.

### *Defendant*

20.     Defendant 3M Company is a Delaware corporation with its principal place of business at 3M Center, St. Paul, Minnesota 55144.

21.     3M may be served with process through its registered agent, Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, IL 62703.

22.     3M conducts business throughout the United States, including in the State of . Illinois.

23.     3M operates a manufacturing facility along the banks of the Mississippi River at its Cordova, Illinois Facility.

•   25.     The Cordova Facility began operations in 1970.

26.     3M discharged, emitted, placed, disposed of, leaked, spilled, and/or abandoned PFAS and/or PFAS-containing products in the State of Illinois at, from, or around the Cordova Facility and was responsible for activities causing the release of PFAS into the environment at, from, or around the Cordova Facility.

27.     This conduct has caused past and ongoing injury to Illinois' natural resources, environment, and public health and welfare.

28.     To the extent any act or omission of 3M is alleged in this Complaint, the officers,

directors, agents, employees, or representatives of 3M committed or authorized each such act or

omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of 3M, and did so while acting within the scope of their duties, employment, or agency.

29.    All references to 3M in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of 3M.

## JURISDICTION AND VENUE

30.    This Court has jurisdiction over the subject matter of this action pursuant to Article VI, Section 9 of the Illinois Constitution, Ill. Const. Article VT, Section 9.

31.    Jurisdiction is proper pursuant to 735 ILCS 5/2-209 (2020), because 3M, at all relevant times: (i) transacted business in Illinois, (ii) committed tortious actions within Illinois; and (iii) owned, used, or possessed real estate within the state of Illinois. *See* 735 ILCS 5/2-209.

32.    Venue is proper pursuant to 735 ILCS 5/2-101(1) and (2) (2020), because the Cordova Facility is located in Rock Island County, Illinois and because the causes of action stated herein arose out of underlying activities that occurred at the Cordova Facility located in Rock Island County, Illinois.

33.    3M's connections with the State of Illinois are consistent with the requirements of the Due Process Clause of the Fourteenth Amendment given that 3M has purposefully availed itself of the privilege of conducting activities in Illinois, the causes of action arise from 3M's activities in Illinois, and 3M's activities are substantially connected to Illinois to make the exercise of jurisdiction over 3M reasonable.

34.    Plaintiff is a resident of Rock Island County, Illinois.

35.    Damages Plaintiff seeks are a result of contamination that occurred in Rock Island County, Illinois from 3M's Cordova Facility.

## THE CORDOVA FACILITY

36.    From approximately 1970 to the present, 3M has owned and operated the Cordova

Facility.

37.    At its Cordova Facility, 3M manufactures numerous chemical products, including

COPY

adhesives, resins, fluorochemicals,. And other specialty chemicals.

38.     The Cordova Facility is located on the banks of the Mississippi River. The Cordova Facility is situated on roughly 740 acres, with approximately 1.2 miles of river frontage on the Mississippi River.

39.     3M produced and used several different PFAS analytes at the Cordova Facility that had the potential to be discharged, emitted, placed, disposed of, leaked, spilled, and/or abandoned at, from, or around the Cordova Facility.

40.     On information and belief, 3M manufactured and disposed of PFAS and/or PFAS-containing products at the Cordova Facility in a manner that caused PFAS to be released into Illinois' environment.

41.     The United States Environmental Protection Agency ("US EPA"). has established a combined lifetime health advisory level for PFOA and PFOS of 70 parts per trillion ("ppt") ("EPA Health Advisory Level").

42.     As further alleged herein, the Illinois EPA has established health advisories containing health-based guidance levels for several PFAS ("Health Advisory Levels").

43.     As set forth more fully in the factual allegations below, 3M has detected PFAS on and around the Cordova Facility at levels injurious to public health and welfare and to the environment.

44. As set forth more fully in the factual allegations below, 3M has detected PFAS in wastewater at, from, and around the Cordova Facility at levels injurious to public health and welfare and to the environment.

45. For example, in June 2020, at one groundwater monitoring well located in the Cordova Facility's manufacturing area, 3M detected PFOA at 5570 ppt and PFOS at 80,800 ppt.

46.    These levels are injurious to public health and welfare and to the environment and are thousands of times higher than the EPA Health Advisory Level and the Illinois EPA's current Health Advisory Levels.

47.    US EPA has also recently detected levels of PFAS in wastewater from the Cordova Facility at levels exceeding Illinois EPA 's current Health Advisory Levels and the EPA Health Advis01y Level.

48.    For example, in December 2019, US EPA detected PFOS levels of 19,600 ppt and PFOA levels of 605 ppt in wastewater that would eventually be discharged from the Cordova Facility directly into the Mississippi River.

49.    These levels are injurious to public health and welfare and to the environment and are hundreds of times above both the US EPA Health Advisory Level and the Illinois EPA's current Health Advisory Levels.

50.    The PFAS described in the preceding paragraphs emanated from the Cordova Facility, and Donna now seeks to: (a) hold 3M liable for monetary damages for the health conditions she has developed due to her exposure to the resulting contamination; (b) obtain monetary damages for the diminution in her property's values as a result of the contamination 3M has caused from the PFAS released from the Cordova Facility; (c) recover monetary damages for the loss of use and enjoyment of her properties resulting from the PFAS contamination described herein; and (d) obtain any other equitable relief as appropriate.

## FACTUAL ALLEGATIONS

**I.     PFAS are toxic and pose substantial health and environmental risks.**

50.    PFAS are a family of chemical compounds containing strong carbon-fluorine bonds.[2]

51.    PFAS have been used for decades in a wide array of consumer and industrial products.[3]

52.    Among thousands of other uses, PFAS may be used to keep food from sticking to cookware, to make sofas and carpets resistant to stains, to make clothes and mattresses more waterproof, and to make some food packaging resistant to grease absorption. [4]

53.    Because PFAS help reduce friction, they are also used in a variety of other industries, including aerospace, automotive, building and construction, and electronics[5]

54.    PFAS are human-made, synthetic chemicals that do not exist naturally in the environment[6]

55.    Known pathways for PFAS to enter the environment include releases to air, land, surface wat r, and groundwater from industrial processes and facilities and from disposal by industrial processes and facilities.[7]

56.    PFAS are known as "forever" chemicals, because they are extremely persistent in

---

[2] *EPA 's Per- and Polyjluoroalky/ Substances (PFAS) Action Plan, supra* n. 1 at 9.

[3] *Id.* at l; *see also PFAS Strategic Roadmap, supra* n. I at 5.

[4] *See Per- and Polyfluoroalkyl Substances (PFAS),* U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (Aug. 3, 2021), https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html?utm\_source=direct&utm mediurn=prod&utm campaign=ntp2:olinks&utm term=pfas.

[5] *An Overview of Perfluoroalkyl and Polyfluoroalkyl Substances and Interim Guidance, supra* n. I at I.

[6] *See, e.g., EPA 's Per- and Polyfluoroalkyl Substances (PFAS) Action Plan, supra* n. **1 at l;** *see also PFAS Strategic Roadmap, supra* n. 1 at 6.

[7] *See Per- and Polyfluoroalkyl Substances (PFAS),* ILLINOIS ENVIRONMENTAL PROTECTION AGENCY https://www2.illinois.gov/epa/topics/water-gualitvipfas/P.1gcs/default.asp1.-;;(last visited Mar. 12, 2022).

COPY

the environment and resistant to typical environmental degradation processes. [8]

57.    The persistence of PFAS and their resistance to biodegradation leads to their accumulation in the environment.[9]

58.    PFAS behave differently depending on their makeup, but generally absorb poorly and tend to be mobile in soil and groundwater systems.

59.    This combination of properties has been observed to enable PFAS to readily migrate in soil, groundwater, and surface water.[10]

60.    The pernicious characteristics of PFAS mean that once these chemicals are released into the environment, they tend to migrate into and can cause extensive contamination and injury to natural resources and property under the jurisdiction of the State.[11]

61.    Humans are exposed to PFAS through ingestion of drinking water and contaminated food, inhalation, dermal contact, and other pathways.[12]

62.    PFAS bioaccumulate in the human body and can biomagnify in animals, particularly fish and "top of the food chain" mammals.[13]

---

[8] *See* Keith Matheny, *Internal Documents Show 3M Hid PFAS Dangers for Decades,* DETROIT FREE PRESS (May 9, 2019), https://www.freep.com/story/news/local/michi2:an/20    ! 9/05/09/3-rn-lawsuit-pfas-water contamination-michigan/3291156002/.

[9] *See EPA's Per- and Polyjluoroalkyl Substances (PFAS) Action Plan, supra* n. 1 at 9.

[10] John A. Simon, *Editor's perspective - Per- and poly.fluorinated substances pose substantial challenges to remediation practitioners,* 28 THE JOURNAL OF ENVIRONMENTAL CLEANUP COSTS, TECHNOLOGIES, AND TECHNIQUES 3, 3-7 (2018), https://onlinelibrary.wilev.com/doi/full/ 10.1002/rem.2 i547.

[11] *See generally id.*

[12] *See An Overview of Perfluoroalkyl and Polyfluoroalkyi Substances and Interim Guidance, supra* n. 1 at 1.

[13] *See, e.g.,* Christopher Wanjek, *Breast-Fed Babies Show Buildup of Potentially Harmful Chemical,* Fox NEWS (Oct. 16, 2015, 7:13 PM EDT), https://www.foxnews.com/health/breast-fed-babies-show-lmildup: of-potentiallv-hannful-chemical.

COPY

63.     PFAS can even be found in the blood of human infants. [14]

64.     Breast milk appears to be a source of PFAS exposure.[15]

65.     Chronic exposure to PFAS at low doses can result in adverse health effects for humans as well as animals.[16]

66.     Exposure to PFAS is connected with a wide array of harmful and serious health effects in humans and animals, including but not limited to:

      (a) Liver damage,

      (b) Altered cholesterol levels,

      (c) Pregnancy-induced hypertension and/or preeclampsia,

      (d) Thyroid disease,

      (e) Modulation of the immune system,

      (t) Decreased fertility, and

      (g) Decrease in birth weight.[17]

67.     PFAS contamination is a serious threat to human health and State natural resources and property.

68.     Pursuant to 35 Ill. Adm. Code 620.605, the Illinois EPA shall issue a Health Advisory when there is a confirmed detection in a community water supply well of a chemical substance for which no numeric groundwater standard exists. The guidance levels contained in a Health Advisory represent concentrations in drinking water at which no adverse health effects are

---

[14] *See Toxicological Profile for Perfluoroalkyls,* U.S. DEP'T OF HEALTH AND HUMAN SERVICES, AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY (May 2021 ), https:/i/w.'v'w.atsdr.cclc.gov/toxprofiles/tp200.pdf.

[15] *Id.*

[16] *Id.*

[17] *See id.*

expected to occur. A Health Advisory can be issued in the absence of standards under Section 620.410, groundwater quality standards, and when "the chemical substance is toxic or harmful to human health."

69.    The Illinois EPA must consider the guidance level established in a Health Advisory when (1) establishing "groundwater cleanup or action levels whenever there is a release or substantial threat of a release of... [a] hazardous substance or pesticide ... or [o]ther contaminant that represents a significant hazard to public health or the environment;" (2) determining "whether the community water supply is taking its raw water from a site or source consistent with the [applicable] siting and source water requirements;" and (3) developing Illinois Pollution Control

Board ("IPCB") "rulemaking proposals for new or revised numerical standards."[18]

70.    On January 28, 2021, the Illinois EPA announced Health Advisory Levels for PFBS, PFHxS, PFHxA, and PFOA.[19] On April 16, 2021, the Illinois EPA announced a new Health Advisory Level for PFOS and a revised limit for PFBS because the US EPA updated its Provisional Peer-Reviewed Toxicity Value for PFBS.[20] On July 27, 2021, the Illinois EPA announced a new Health Advisory Level for PFNA.

71.    The current Illinois EPA Health Advisory Levels are listed below.

---

[18] 35 Ill. Admin. Code Section 620.601.

[19] *See Illinois EPA Issues Health Advisories for Per- and Polyjluoroalkyl Substances (PFAS_ in Accordance with Illinois Groundwater Regulations,* ILLINOIS ENVIRONMENT AL PROTECTION AGENCY, https://www.illinois.gov/newsipress-release.22728.html (last visited Mar. 13, 2022).

[20] *See Illinois Issues Health Adviso,y.for Perfluorooctanesu(fonic Acid (PFOS) and an Updated Health Advisory for Pe,jluorobutanesul.fonic Acid (PFBS),* ILLINOIS ENVIRONMENTAL PROTECTION AGENCY (Apr. 16, 2021), https://www2.illinois.go /Pages/news-itcrn.aspx?ReleaseID=23I 51.

| Specific PFAS | Health Advisory Level in Nanograms/Liter (ppt) | Chemical Abstract Services Registry Number (CASRN) |
|---|---|---|
| PFOA | 2 | 335-67-1 |
| PFHxA | 560,000 | 307-24-4 |
| PFOS | 14 | 1763-23-1 |
| PFHxS | 140 | 355-46-4 |
| PFBS | 2,100 | 375-73-5 |
| PFNA | 21 | 375-95-1 |

72.     On May 12, 2021, the Illinois EPA announced in a Pre-Filing Public Comment Period that it was proposing draft language to update its groundwater quality standards in 35 Ill. Adm. Code 620 for five PFAS- PFBS, PFHxS, PFOA, PFNA, and PFOS.

73.     On December 8, 2021, the Illinois EPA filed with the Illinois Pollution Control Board a Motion for Acceptance requesting that the Illinois Pollution Control Board accept the proposed groundwater quality standards for six PFAS - PFBS, PFHxS, PFOA, PFNA, PFOS, and HFPO-DA.[21] The proposed standards are listed below:

| Specific PFAS | Proposed Class I and Class II Groundwater Quality Standard in Nanograms/Liter (ppt) | Chemical Abstract Services Registry Number (CASRN) |
|---|---|---|
| PFOA | 2 | 335-67-1 |
| PFNA | 12 | 375-95-1 |

---

[21] *See* *620* *Groundwater* *Quality,* ILLINOIS ENVIRONMENTAL PROTECTION AGENCY, https://www2.illinois.gov/epa/about-us/rules-regs/water/Pages/620-Groundwater Quality.aspx), (last visited Mar. 12, 2022).

COPY

| PFOS | 7.7 | 1763-23-1 |
|------|-----|-----------|
| PFHxS | 77 | 355-46-4 |
| PFBS | 1,200 | 375-73-5 |
| HFPO-DA | 12 | 13252-13-6 |

74.     Because PFAS are persistent in the environment, unless PFAS are actively cleaned up from contaminated natural resources and property under the jurisdiction of the State, these chemicals will remain within the State and continue to contaminate natural resources and property under the jurisdiction of the State indefinitely.

**II.     3M manufactured and used PFAS at the Cordova Facility with full knowledge of PFAS health and environmental risks, which 3M intentionally hid from the public and the State.**

75.     3M negligently operated its Cordova Facility such that it allowed the discharge, emission, placement, disposal, leakage, spillage, and/or abandonment of PFAS from the Cordova Facility in such a way as to cause harm to the State's environment and natural resources.

76.     3M has known for decades that PFAS are toxic and pose substantial health and environmental risks.

77.     Notwithstanding that knowledge, 3M persistently and intentionally hid this information from Illinois and the public.

78.     As early as the 1950s, 3M's internal animal studies found that PFAS are "toxic," and this finding was confirmed in further studies throughout the late 1970s and I 980s.[22]

79.     By the 1960s, 3M knew that perfluorochemicals, a subgroup of PFAS, are stable

---

[22] Lori Swanson, *Former Attorney General of Minnesota Testimony Before the Committee on Oversight and Reform, Subcommittee on Environment, United States House of Representatives* (Sept. 1 0, 2019), at 3- 4, https://www.cong:rcss.gov/116/mcctingihousc/l    09902/witnesscs!HHRG-1    I6-GO?8-\"/statc-SwansonL-2019091 O.pdf (hereinafter referred to as "Swanson Testimony").

and persist in the environment and do not degrade. [23]

80.    3M conducted studies in the 1970s that confirmed that PFOS is toxic to a variety of aquatic wildlife, including various fish species and aquatic invertebrates.[24]

81.    In 1975, Dr. Warren Guy and Dr. Donald Taves, two independent scientists, found PFAS in human blood banks across the country and contacted 3M to inform them that they thought 3M chemicals might be to blame and to inquire whether fluorocarbon carboxylic acids were present in items in use by the public, like Scotchgard.[25]

82.    A 3M memorandum documenting the call noted that 3M "plead ignorance" and refused to identify the chemicals in Scotchgard.[26]

83.    3M conducted its own study like the study performed by Drs. Guy and Taves and confirmed that PFAS were present in human blood.[27]

84.    3M conducted multiple studies throughout 1975 and 1976 that confirmed the presence of PFAS in blood of the workers who handled PFAS at levels between 50 to 1000 times higher than "normal" levels.[28]

85.    Despite this, in 1976, 3M lawyers urged 3M not to disclose that the "true identity" of the chemical in the blood was PFOS.[29]

86.    By the late 1980s, 3M employees were questioning 3M's advertisement that PFAS chemicals were biodegradable.

---

[23] *Swanson Testimony,* at 3.

[24] *Swanson Testimony,* at Exhibit K.

[25] *Swanson Testimony,* at Exhibit D.,

[26] *Id.*

[27] *Swanson Testimony,* at Exhibit E.

[28] *Id.*

[29] *Swanson Testimony,* at Exhibit F.

87.     In a December 1988 email, a 3M employee sent an email to other 3M employees stating "I don't think it is in 3M's long-term interest to perpetuate the myth that these fluorochemical surfactants are biodegradable. It is probable that this misconception will eventually be discovered, and when that happens, 3M will likely be embarrassed, and we and our customers may be fined and forced to immediately withdraw products from the market."[30]

88.     By 1993, 3M was aware that there was some evidence that lactating goats transferred PFAS to their kids in milk and it was likely that a similar phenomenon would occur in humans.[31]

89.     In 1997, 3M provided DuPont with a Material Safety Data .Sheet for FC-118 Fluorad Brand Fluorochemical Surfactant, which included a warning that stated: "CANCER: WARNING: Contains a chemical which can cause cancer. (3825-26-1) (1983 and 1993 studies conducted jointly by 3M and DuPont)."[32]

90.     3825-26-1 is the Chemical-Abstract Services Registry Number ("CASRN") for Pentadecafluorooctanoic acid ammonium salt, which is a chemical form of PFOA.

91.     In 1998, a 3M scientist, Dr. Richard Purdy conducted a risk assessment of potential adverse effects on marine mammals from PFOS in the food chain and informed 3M of his findings that there was a significant risk of harm of food chain transfer, and that "the levels we are seeing in eagles and other biota is likely to climb each year."[33]

92.     Despite all of this knowledge, 3M continued to manufacture and dispose of PFAS

---

[30] *Swanson Testimony,* at Exhibit H.

[31] *Swanson Testimony,* at 5.

[32] *Swanson Testimony,* at Exhibit A.

[33] Richard E. Purdy, *Email to Ge01jean Adams re: Risk to the environment due to the presence of PFOS*
(Dec. 3, 1998, 11:53 AM), https:i/static.ewg.org!reprn1s/2019/pl Himelinei1998 Food-Chain.pdf

at multiple facilities, including the Cordova Facility.

93. More troubling, 3M actively engaged in a campaign to promote perfluorochemicals as safe to manufacture and use and to distort scientific evidence concerning potential harms associated with perfluorochemicals.

94. 3M hired Dr. John P. Giesy, a professor and academic journal editor, to review several studies of chemicals before they were published and paid him a considerable amount of money in exchange for his services.[34]

95. Dr. Giesy would share manuscripts of potentially harmful studies with 3M before they were published and advised 3M to "keep 'bad' papers out of the literature otherwise in litigation situations they can be a large obstacle to refute."[35].

96. Dr. Giesy informed 3M that he made sure his timesheets were written in a way so that "there was no paper trail to 3M."[36]

97. In 1999, the 3M scientist who conducted the study about movement of PFAS through the food chain, Dr. Richard Purdy, was so outraged by 3M's actions related to PFAS that he resigned in protest and copied US EPA on his resignation letter stating that he could "no longer participate" in a 3M process that put "markets, legal defensibility and image over environmental safety."[37]

98. Dr. Purdy further stated in his letter that "Perfluorooctanesulfonate is the most insidious pollutant since PCB. It is probably more damaging than PCB because it does not

---

[34] *Swanson Testimony,* at 6.

[35] *Swanson Testimony,* at Exhibit L

[36] *Id.*

[37] *Swanson Testimony,* at Exhibit B.

degrade."[38]

99.    Dr. Purdy further stated in his letter that "3M continues to make and sell these chemicals though the company knows of an ecological risk assessment I did that indicates there is a better than 100% probability that perfluorooctanesulfonate is biomagnifying in the food chain and harming sea mammals ... 3M told those of us working on the fluorochemical project not to write down our thoughts or have email discussions on issues because of how our speculations could be viewed in a legal discovery process."

100.    3M has earned extraordinary profits from its PFAS manufacturing business.

101.    In 2000, when 3M agreed to stop making forms of PFAS under pressure from the US EPA, it was making almost $500,000,000 per year from these types of products.[39]

10 2.    In 2006, EPA fined 3M $1.5 million for its withholding of studies about the toxicity of PFAS that were required to be reported under the Toxic Substances Control Act.[40]

102.    Despite its explicit knowledge of the dangers of PFAS, 3M deliberately and intentionally concealed the dangers of PFAS from governmental entities, including the State of Illinois and its agencies, and the public at large to protect profits and avoid public responsibility for injuries and damage caused by their toxic products.

103.    To this day, 3M continues to actively deny the adverse effects on the environment and human health caused by PFAS contamination, stating on its company webpage that "[t]he weight of scientific evidence from decades of research does not show that PFOS or PFOA causes

[38] *Id.*

[39] *Swanson Testimony,* at 2.

[40] *Id.* at 5.

harm in people at current or past levels."[41]

104.   3M's negligent, intentional, and reckless actions have contaminated property and natural resources under the jurisdiction of the State at and around the Cordova Facility, harmed propeliy and natural resources under the jurisdiction of the State at and around the Cordova Facility, and placed Illinois residents at risk.

## VIII.    PFAS contamination at the Cordova Facility.

105.   At all relevant times, 3M manufactured PFAS at the Cordova Facility, discharged PFAS-containing waste directly into the Mississippi River, disposed of PFAS-containing sludge from its wastewater treatment plant ("WWTP"), emitted airborne PFAS, and spilled and leaked PFAS from containers, piping systems, tanks, and the wastewater treatment process, all of which resulted in significant contamination of surface waters, groundwater, drinking water, wetlands, soil, sediment, and air at and around the Cordova Facility.

106.   3M's operations that have resulted in the discharge of PFAS and PFAS-containing waste into the surrounding surface waters, groundwater, drinking water, wetlands, soil, sediment, and air at and around the Cordova Facility continue to this day.

107.   3M discharges untreated, non-contact cooling water that is contaminated with PFAS into the Mississippi River.

108.   Stormwater contaminated with PFAS from the Cordova Facility migrates into groundwater and also flows into the Mississippi River.

109.   June 2020 sample results for Monitoring Well 3-94, which is a 3M groundwater monitoring well located in the Cordova Facility's manufacturing area, indicated that PFAS levels

---

[41] *See 3M's Commitment to PFAS Stewardship,* 3M, hHps:/www.3m.comi3M/en US/pfr1s-stewardship us/health-sciencei (last visited Mar. 13, 2022).

were significantly higher than the Illinois EPA's current Health Advisory Levels and proposed

groundwater quality standards.[42]

| Specific PFAS | June 2020 Sample Result in Nanograms/Liter (ppt) | Proposed Groundwater Quality Standard in Nanograms/Liter (ppt) | Health Advisory Level in Nanograms/Liter (ppt) |
|---|---|---|---|
| PFOA | 5,570 | 2 | 2 |
| PFOS | 80,800 | 7.7 | 14 |
| PFBS | 353,000 | 1200 | 2100 |

110.    The June 2020 sample results for Monitoring Well 3-81, which is another 3M

groundwater monitoring well located in the Cordova Facility's former sludge incorporation area,

indicated that PFAS levels were significantly higher than the Illinois EPA's current Health Advisory

Levels and proposed groundwater quality standards.

| Specific PFAS | June 2020 Sample Result in Nanograms/Liter (ppt) | Proposed Groundwater Quality Standard in Nanograms/Liter (ppt) | Health Advisory Level in Nanograms/Liter (ppt) |
|---|---|---|---|
| PFOA | 6,650 | 2 | 2 |
| PFOS | 62,800 | 7.7 | 14 |

111.    3M's wastewater discharge sampling also demonstrates that levels of PFAS in its

wastewater are injurious to public health and welfare and to the environment.

112.    For example, in 2020, PFOA, PFOS, and PFNA were found at elevated levels in

---

[42] 3M's annual monitoring result reports only include groundwater sampling results for the following Pf AS compounds: PFBA, PFOA, PFBS, PFHxS, PFOS, and PFNA.

COPY

wastewater from Outfall 001, an outfall with an average discharge of 8.1 million gallons per day of wastewater.

| Specific PFAS | Sample Result in Nanograms/Liter (ppt) |
|---|---|
| PFOA | 583 |
| PFOS | 17,300 |
| PFNA | 946 |

113. In addition to the sampling performed onsite at the Cordova Facility, 3M also completes annual sampling of residential wells located close to the Cordova Facility.

114. 3M has detected significant levels of PFAS in groundwater in nearby areas around the Cordova Facility. These include one of the properties owned by the Plaintiff.

115. 3M has detected concentrations of PFBA at nearly every residential well sampled during every year that sampling has occurred.

116. The detection methods that 3M historically used for PFOA, PFBS, PFHxS, and PFOS were *not* USEPA approved methods and were *not* sufficiently precise and low enough to determine if the water tested from each residential well had detections above the Illinois EPA's current Health Advisory Levels and proposed groundwater quality standards.

117. For example, the laboratory's detection limits used up until the 2020 sampling were 0.0240 ppb for PFOA and 0.0232 ppb for PFOS, which convert to 24 ppt and 23.2 ppt, respectively.

118. The Illinois EPA Health Advisory Level for PFOA is 2 ppt, and the Illinois EPA Health Advisory Level for PFOS is 14 ppt.

119. ⋅ Similarly, the Illinois EPA's proposed groundwater standards for PFOA and

PFOS are 2 ppt and 7.7 ppt, respectively.

COPY

120. It was not until 2020 that the laboratory 3M retained to analyze the residential well results used a sufficiently sensitive detection limit to compare the results to the Illinois EPA's current Health Advisory Levels and proposed groundwater standards.

121. The 2020 residential well results show that multiple residential wells had sample results that exceeded the Illinois EPA's current Health Advisory Levels and proposed groundwater standards.

122. For example, the PFOA results in Residential Wells 23321 and 22610 were 5.1 ppt and 10 ppt, respectively, which exceeds the Illinois EPA's current Health Advisory Level and proposed groundwater objective of 2.0 ppt.

123. On December 28, 2012, the Illinois EPA issued NPDES Permit No. TL0003140 ("NPDES Permit"), which required quarterly monitoring of fourteen PFAS, including: Perfluorobutanoic Acid ("PFBA".); Perfluoroundecanoic Acid ("PFUnA"); Perfluoropentanoic Acid ("PFPeA"); Perfluorododecanoic Acid ("PFDoA"); Perfluorohexanoic Acid ("PFHxA"); Perfluorotridecanoic Acid ("PFTrDA"); Perfluoroheptanoic Acid ("PFHpA"); Perfluorobutanesulfonate ("PFBS"); Perfluorotanoic Acid ("PFOA"); Perfluorohexanesulfonate ("PFHeS"); Perfluorononanoic Acid ("PFNA"); Perfluorooctanesulfonate ("PFOS"); Perfluorodecanoic Acid ("PFDA"); and Perfluorooctanesulfonamide ("PFBSA").

124. 3M informed US EPA in November 2019, and the Illinois EPA in January 2020, that 3M "had not fully characterized its PFAS discharge in its NPDES Permit for the Cordova Facility."[43] 3M has indicated the need to include additional PFAS analytes in the NPDES monitoring program since it did not include PFAS identified from a 2015 analysis in its NPDES

---

[43] *3M SEC Form 10-Q for the Quarter(y Period that ended March 31. 2020,* 3M, https://s24.q4cdn.com/83403_1_268/files/doc_financials/2020iqliO1-2020-10-0_..Q.QJ (last visited Mar. 13, 2022).

monitoring.

125. In an earnings conference· call in January 2020, Mike Roman, 3M's Chairman and Chief Executive Officer, noted that 3M had discovered a PFAS discharge issue at its Cordova facility.[44]

126. In December 2019, US EPA conducted a Clean Water Act and Resource Conservation and Recovery Act inspection of the Cordova Facility.

127. As part of this inspection, the US EPA took water and wastewater samples from several different locations at the Cordova Facility and tested the samples for 36 target PFAS analytes.

128. The results from US EPA's December 2019 sampling demonstrate that multiple PFAS analytes were detected at levels injurious to public health and welfare and to the environment and at orders of magnitude above the Illinois EPA's current Health Advisory Levels and proposed groundwater standards and the US EPA Health Advisory Level.

129. US EPA's inspection report notes that the samples "show the discharge of elevated concentrations of several PFAS to the Mississippi River and the discharge of several PFAS that are not listed in 3M Cordova's NPDES Permit and, therefore, not monitored for in the discharge."

130. For example, US EPA collected samples from the production wellfield water, which is used for process water purposes and as once-through non-contact cooling water, and then discharged as untreated non-contact cooling water to the Mississippi River via Outfall 001 at an average flow of 8.1 million gallons per day. The samples contained elevated levels of PFOA, PFOS, PFHxS, and PFNA. .

---

[44] Sylvia Carignan, *3M Hit with $214 Million in PFAS Litigation Costs in Three Months;* BLOOMBERG LAW (Jan. 28, 2020), https://news.bloomberglaw.comienvironment-and-energvi3m-hit-with-¹14-million-in pfas-litigation-costs-in-three-months.

| Specific PFAS | Sample Result in Nanograms/Liter (ppt) |
|---|---|
| PFOA | 907 |
| PFOS | 24,400 |
| PFHxS | 1,610 |
| PFNA | 1,210 |

131.   US EPA also collected samples from impounded wastewater and stormwater at Outfall 004 and outlet/outfall B. US EPA noted in its inspection report that "[w]hile the following results are of impounded wastewater/stormwater and not of actual discharge events, the elevated concentrations of PFAS in the impounded wastewater/stormwater provide an indication of PFAS levels in stormwater runoff from two facility drainage areas, that could be released and discharged to the Mississippi River or percolate into the groundwater." The samples contained elevated levels of PFOA, PFOS, PFHxS, and PFNA.

| Specific PFAS | Sample Result in Nanograms/Liter (Outfall 004, Outlet/Outfall B) (ppt) |
|---|---|
| PFOA | 84.5 and 136 |
| PFOS | 4,830 and 5,120 |
| PFHxS | 138 and 224 |
| PFNA | 59.1 and 13.1 |

132.   The US EPA also collected three samples during the inspection from Outfall 001, which discharges into the Mississippi River at an average flow of 8.1 million gallons per day. All three samples resulted .in PFAS levels orders of magnitude above the US EPA Health Advisory

COPY

Level

and the Illinois EPA's current Health Advisory Levels for multiple PFAS compounds. The samples contained elevated levels of PFOA, PFOS, PFHxS, and PFNA.

| Specific PFAS | Sample Result in Nanograms/Liter (ppt) |
|---|---|
| PFOA | 605 |
| PFOS | 19, 00 |
| PFHxS | 1,070 |
| PFNA | 684 |

133. Finally, the US EPA also collected samples of the treated process wastewater at Outfall A0l at the Cordova Facility from four different locations. As noted in EPA's Inspection Report, "[f]ollowing the discharge of treated wastewater from outfall AO1, no further treatment of the wastewater occurs, only the mixing of wastewater with facility non-contact cooling water and the subsequent discharge to the Mississippi River." The samples contained elevated levels of PFOA, PFOS, PFHxS, and PFNA.

| Specific PFAS | Sample Result in Nanograms/Liter (ppt) |
|---|---|
| PFOA | 829 |
| PFOS | 11,600 |
| PFHxS | 2,260 |
| PFNA | 864 |

134. US EPA's inspection report also notes that 3M has discharged PFAS into the Mississippi River from outfalls that were not listed in the Cordova Facility's NPDES Permit.

135. 3M's own sampling results confirm EPA's inspection findings that 3M continues to discharge elevated levels of PFAS into the Mississippi River.

136.    3M's Discharge Monitoring Rep0li for the fourth quarter of 2021 demonstrates that
· 3M continues to discharge elevated PFAS levels into the Mississippi River to this day.

137. The chart below includes 3M's quarterly average and quarterly maximum sampling results for PFOA, PFOS, PFNA, and PFHxS for the fourth quarter of 2021:

| Specific PFAS | Quarterly Average in Nanograms/Liter (ppt) | Quarterly Maximum in Nanograms/Liter (ppt) |
|---|---|---|
| PFOA | 221 | 232 |
| PFOS | 4,480 | 4,680 |
| PFNA | 179 | 1.82 |
| PFHxS | 460 | 482 |

138. On September 23, 2021, the Illinois EPA disapproved 3M's 2020 Annual Per- and Polyfluoroalkyl Substances (PFAS) Monitoring Report for the 3M Cordova, IL Facility, June 2021.

139. In its disapproval letter, the Illinois EPA referenced the residential well sample results that were above the Illinois EPA's current Health Advisory Levels and proposed groundwater quality objectives.

140.    The Illinois EPA also referenced the following statement made by 3M in Section 5.5 of 3M's 2020 Report:

> Accordingly, based on the extensive characterization of Site .conditions that has been, and continues to be conducted, and the fact that no exposure pathways of concern have been identified, the establishment of a Groundwater Management Zone ("GMZ") as approved by the Illinois EPA, is confirmed as an effective and appropriate remedial action.

141.    In response to this statement, the Illinois EPA stated in. its disapproval letter that

"the establishment of a GMZ is not considered a remedial action" and "[a] GMZ is part of the Remedial Action Plan (RAP) and works in concurrence with approved remedial actions." The Illinois EPA stated that to continue the GMZ, "a Remedial Action Plan (RAP) proposing a remedy to address the soil and groundwater contamination identified in the site investigation is required, pursuant to 35 Ill. Adm. Code 740.530."

142.   At the time of the filing of this Complaint, 3M has not officially submitted a plan that satisfies the Site Remediation Program requirements.

143.   3M's operations at the Cordova Facility have resulted in PFAS migrating and continuing to migrate into the environment, including, but not limited to, surface water, groundwater, drinking water, wetlands, soils, sediments, air, fish, and wildlife at and around the Cordova Facility in a manner that has caused or tended to cause pollution in the State of Illinois.

144.   The extent of 3M's contamination has not been fully identified, and the State reasonably anticipates further testing will reveal additional surface water, groundwater, drinking water, wetland, soil, sediment, air, fish, and wildlife contamination at and around the Cordova Facility due to 3M's historical and current operations.

## IX.    State natural resource and property damage.

145.   PFAS contamination at and around the Cordova Facility has injured the State's natural resources and/or adversely impacted its beneficial public trust uses including those for drinking water, recreation, fishing, agriculture, and other uses.

146.   PFAS contamination at and around the Cordova Facility has substantially damaged the intrinsic value of these State natural resources.

147.   Illinois and its residents have been deprived of the full use, enjoyment, and benefit of the State's public trust resources, and the intrinsic value of such State natural resources, and have been substantially harmed by PFAS contamination, as identified above.

148. The State's natural resources and property at and around the Cordova Facility will continue to be harmed and injured for the foreseeable future by the ongoing release and/or spread of PFAS, as identified above.

149. 3M's acts and/or omissions have caused and/or contributed to cause PFAS contamination, as identified above.

150. Each of the State's natural resources is precious, limited, and invaluable, as described in more detail below.

## X.    Groundwater.

151. The State's public policy for groundwater is set forth in Section 2 of the Illinois Groundwater Protection Act.

(a)    The General Assembly finds that:

(i)    a large portion of Illinois' citizens rely on groundwater for personal consumption, and industries use a significant amount of groundwater;

(ii)    *contamination of Illinois groundwater will adversely impact the health and welfare o,f its citizens and adversely impact the economic viability o,f the State;*

(iii) contamination of Illinois' groundwater is occuring;

(iv)    *protection of groundwater is a necessity fo_r.future economic development in this State.*

(b)    Therefore, it is the *policy of the State of Illinois to restore, protect, and enhance the groundwaters of the State, as a natural and public resource.* The State recognizes the essential and pervasive role of groundwater in the social and economic well-being of the people of Illinois, and its vital importance to the general health, safety, and welfare. It is further recognized as consistent with this policy that the groundwater resources of the State be utilized for beneficial and legitimate purposes; *that waste and degradation of the resources be prevented; and that the underground water resource be managed to allow for maximum benefit o.l the people of the State o,f Illinois.*

415 ILCS 55/2 (2020) (Emphasis added).

152.  Groundwater resources can be exposed to PFAS contamination in several ways, including when infiltrating precipitation transports surface contaminants from soils through the unsaturated zone and into shallow groundwater.

153.  3M has contaminated and injured the State's groundwater at and around the Cordova Facility with PFAS and PFAS-containing waste.

154.  3M has contaminated and injured groundwater sources and residential wells in locations at and around the Cordova Facility with PFAS and PFAS-containing waste.

155.  Ongoing additional testing continues to reveal further PFAS contamination and injury of groundwater at and around the Cordova Facility. It is virtually certain that additional testing will reveal further PFAS contamination of, and injury to, groundwater.

## XI.  Surface waters.

156.  Section 11 of the Act, 415 ILCS 5/11 (2020), provides, in pertinent part, as follows:

§ 11. (a) The General Assembly finds:

(1) that pollution of the waters of this State constitutes a menace to public health and welfare, creates public nuisances, is harmfulto wildlife, fish, and aquatic life, impairs domestic, agricultural, industrial, recreational, and other legitimate beneficial uses of water, depresses property values, and offends the senses;

             *                *                *

(c) The provisions of this Act authorizing implementation of the regulations pursuant to an NPDES program shall not be construed to limit, affect, impair, or diminish the authority, duties. and responsibilities of the Board, Agency, Department or any other governmental agency or officer, or of any unit of local government, to regulate and control pollution of any kind, to restore, to protect or to enhance the quality of the environment, or to achieve all other purposes, or to enforce provisions, set forth in this Act or other State law or regulation.

157.  Surface waters are precious, limited, and invaluable State natural resources that are used for drinking water, irrigation, recreation such as swimming and fishing, and ecological and other important purposes.

158.    State natural resources, including surface waters, are vital to the health, safety, and welfare of Illinois residents, and to the State's economy and ecology.

159.    Surface water, such as lakes, rivers, and wetlands, can receive groundwater inflow and recharge groundwater. The movement of water between groundwater and surface-water systems leads to the mixing of their water qualities.

160.    3M has contaminated and injured the State's surface water at and around the Cordova Facility with PFAS and PFAS-containing waste.

161.    Ongoing additional testing continues to reveal further PFAS contamination and injury of surface waters at and around the Cordova Facility. It is virtually celiain that additional Jesting will reveal further PFAS contamination of, and injury to, surface waters..

## XII.    Wetlands.

162.    Wetlands are highly productive, biologically diverse, precious, limited, and invaluable State natural resources that enhance water quality, control erosion, maintain stream. flows, sequester carbon, and provide a home to at least one third of all threatened and endangered species, playing an important role in ecological health, drinking water, iITigation, agriculture, and other purposes.

163.    State natural resources, including wetlands, are vital to the health, safety, and welfare of Illinois residents, and to the State's economy and ecology.

164.    Multiple areas in and near the Cordova Facility are listed on the National Wetlands Inventory.

165.    Wetlands can receive groundwater inflow and recharge groundwater. The movement of water between groundwater and surface-water systems such as wetlands can lead to the mixing of their water qualities.

166.    Ongoing additional testing continues to reveal further PFAS contamination. It is virtually certain that additional testing will reveal PFAS contamination ot and injury to, wetlands at and around the Cordova Facility.

## VII.    Wildlife, aquatic life, soils, and sediment.

167.    Wildlife, aquatic life, soil, and sediments are precious, limited, and invaluable State natural resources.

168.    3M has contaminated and injured the State's wildlife, aquatic life, soil, and sediments at and around the Cordova Facility.

169.    Agriculture is one of Illinois' largest industries, contributing billions of dollars annually to Illinois' economy.

170.    Illinois' wildlife and aquatic life are used for food and recreational purposes and provide a significant economic benefit to the State, including through tourism and recreation.

171.    ·        Injuries to wildlife and aquatic life affect not only individual wildlife and aquatic life, but also the entire ecosystem of which they are a part.

172.    Ongoing additional testing continues to reveal fmiher PFAS contamination and injmy of agricultural operation_s, wildlife, aquatic life, soils, and sediment at and around the Cordova Facility. It is virtually certain that additional testing will reveal further PFAS contamination of, and injury to, soils, sediments, wildlife, and aquatic life.

## XIII.    The PFAS contamination caused by 3M must be remediated.

173.    The State seeks, in part, to: (a) hold 3M liable for monetary damages for the cost of identifying, monitoring, and remediating contamination caused by the release of PFAS from 3M's Cordova Facility and all damages to the State's environment and its natural resources because of the resulting contamination; and (b) obtain injunctive relief requiring 3M to take

4:24-cv-04174-JEH   # 1-1   Filed: 09/26/24   Page 44 of 77
4:22-cv-04075-SLD-JEH   # 1-1   Pg 19 of 26
NUMPAGES
69

COPY

action

to prevent ongoing contamination and to remediate the areas contaminated and restore resources injured or impacted by PFAS released from the Cordova Facility.

174. Illinois' environment and natural resources are currently, and may in the future be, detrimentally affected by 3M's PFAS pollution and PFAS contamination at, from, and around the Cordova Facility, as described herein.

175. Proven and preliminary remedial techniques exist for cleaning up PFAS m environmental media and successfully treating drinking water.

176. Absent use of remediation and treatment methods, PFAS contamination will continue to spread through the natural resources and property under the jurisdiction of the State. Although PFAS are persistent in the environment, PFAS can be successfully remediated or successfully treated, and impacts to natural resources can be compensated, but at significant expense.

17.7. PFAS contamination levels in State natural resources at and around the Cordova Facility, including surface water, groundwater, and wetlands, typically fluctuate *(i.e.,* increase and decrease) over time as PFAS moves through water and by other factors that impact hydrology, such as changes in seasonal precipitation levels. Because PFAS levels can fluctuate.at a single PFAS contamination site over time, the only way to be certain that PFAS no longer exist in State natural resources, such as surface water, groundwater, and wetlands, is to remediate or treat the PFAS.

178. The presence and migration of PFAS in State natural resources and property at and around the Cordova Facility, absent large-scale and costly remediation ai1d/or treatment, will continue indefinitely and will continue to indefinitely threaten such natural resources and property.

COPY

179. Because of the injury PFAS have caused and are causing to the environment and natural resources under the jurisdiction of the State at and around the Cordova Facility, 3M must remediate PFAS contamination and restore these natural resources, and the State is entitled to compensation for interim and pe1manent losses to its natural resources, as well as any costs it incurs in restoring its natural resources.

180. The State reserves its right to amend this Complaint as additional evidence of PFAS contamination comes to light including, but not limited to, PFAS contamination of wildlife, aquatic life, waters, soils, sediments, and other State natural resources arising from/related to 3M's actions and omissions in its ownership and operation of the Cordova Facility.

## CLAIMS ALLEGED

## COUNT I - NEGLIGENCE PER SE
### WATER POLLUTION UNDER SECTION 12(a)
### OF THE ILLINOIS ENVIRONMENTAL PROTECTION ACT

181. The Plaintiff repeats, realleges, and incorporates by reference each allegation contained in Paragraphs 1-180, above, as though fully set fo1ih herein.

182. Section 12(a) of the Act, 415.ILCS 5/12(a) (2020), provides that, "[n]o person shall: (a) cause or threaten or allow the discharge of any contaminants into the environment in any State so as to cause or tend to cause water pollution in Illinois, either alone or in combination with matter from other sources, or so as to violate regulations or standards adopted by the Pollution Control Board under this Act."

183. Section 11 of the Act, 415 ILCS 5/11 (2020), provides, in pertinent part, as follows:

§ 11. (a) The General Assembly finds:

(1) that pollution of the waters of this State constitutes a menace to public health and welfare, creates public nuisances, is harmful to wildlife, fish, and aquatic life, impairs domestic, agricultural, industrial, recreational, and other legitimate beneficial uses of water, depresses property values, and offends the senses;

COPY

       *              *             *

(c) The provisions of this Act authorizing implementation of the regulations pursuant to an NPDES program shall not be construed to limit, affect, impair, or diminish the authority, duties and responsibilities of the Board, Agency, Department or any other governmental agency or officer, or of any unit of local government, to regulate and control pollution of any kind, to restore, to protect or to enhance the quality of the environment, or to achieve all other purposes, or to enforce provisions, set forth in this Act or other State law or regulation.

184.    Section 3.315 of the Act, 415 ILCS 5/3.315 (2020), provides that a "person" is "any individual, partnership, co-partnership, firm, company, limited liability company, corporation, association, joint stock company, trust, estate, political subdivision, state agency, or any other legal entity, or their legal representative, agent or assigns."

185.    Defendant, 3M is a corporation, and therefore is a "person" as that term is defined in Section 3.315 of the Act, 415 ILCS 5/3.315 (2020).

186.    Section 3.165 of the Act, 415 ILCS 5/3.165 (2020), broadly defines "contaminant" as "any solid, liquid, or gaseous matter, any odor, or any form of energy, from whatever source."

187.    PFAS compounds constitute "contaminants" as that term is defined in Section 3.165 of the Act, 415 ILCS 5/3.165 (2020).

188.    Section 3.545 of Act, 415 ILCS 5/3.545 (2020), broadly defines "water pollution" as "such alteration of the physical, thermal, chemical, biological or radioactive properties of any waters of the State, or such discharge of any contaminant into any waters of the State, as will or is likely to create a nuisance or render such waters harmful or detrimental or injurious to public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate uses, or to livestock, wild animals, birds, fish, or other aquatic life."

189.    Section 3.550 of the Act, 415 ILCS 5/3.550 (2020), defines "waters" as "all accumulations of water, surface and underground, natural, and a1iificial, public and private, or parts thereof, which are wholly or partially within, flow through, or border upon this State."

190.    The Mississippi River and other surface waters, groundwater, and wetlands at and around the Cordova Facility constitute "waters" as that term is defined in Section 3.550 of the Act, 415 ILCS 5/3.550 (2020).

191.    The threatened and actual discharge of PFAS-containing wastewater, stormwater, and wastewater sludge and other direct and indirect discharges of PFAS and PFAS-containing substances from the Cordova Facility into the Mississippi River and other surface waters, groundwater, and wetlands at and around the Cordova Facility tends to cause a nuisance, because such discharges negatively impact commercial and recreational uses of the Mississippi River and render (or are likely to render) the Mississippi River, other surface waters, groundwater, and wetlands at and around the Cordova Facility harmful, detrimental, or injurious to public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate uses, or to livestock, wild animals, birds, fish, or other aquatic life, thereby causing or tending to cause water pollution, as that term is defined in Section 3.545 of the Act, 415 ILCS 5/3.545 (2020).

192.    By threatening, causing, or allowing the discharge of PFAS-containing wastewater, stormwater, and wastewater sludge and other direct and indirect discharges of PFAS and PFAS containing substances from the Cordova Facility into the Mississippi River and other surface waters, groundwater, drinking water, and wetlands at and around the Cordova Facility, so ·as to cause or tend to cause water pollution, 3M violated Section 12(a) of the Act, 415 ILCS 5/12(a) (2020).

193. Violations of the pertinent environmental statutes will continue until and unless this Court grants equitable relief in the form of an immediate and, after trial, permanent injunction.

**WHEREFORE**, Plaintiff, Donna Deufel requests that this Court enter an Order:

(a) Finding that 3M violated Section I 2(a) of the Act, 415 ILCS 5/12(a) (2020);

(b) Enjoining 3M from committing any further violations of Section I 2(a) of the Act, 415 ILCS 5/12(a) (2020);

(c) Ordering that 3M take immediate, necessary action to correct its violations of Section 12(a) of the Act, 415 ILCS 5/12(a) (2020), which would include, without limitation, the investigation and remediation of all PFAS contamination at and around the Cordova Facility;

(d) Assessing a civil penalty exceeding Fifty Thousand Dollars ($50,000.00) against 3M for each of its violations of the Act and pertinent regulations, and an additional civil penalty of Ten Thousand Dollars ($ I 0,000.00) for each day of violation;

(e) Ordering 3M, pursuant to 415 ILCS 5/42(f) (2020) to pay all costs, including oversight, sampling, and clean-up costs, and attorney, expert witness, and consultant fees expended by Plaintiff in its pursuit of this action; and

(f) granting such other and further relief as this Court deems appropriate and just.

## COUNT II - NEGLIGENCE PER SE
## CREATING A WATER POLLUTION HAZARD UNDER SECTION 12(d) OF THE ILLINOIS ENVIRONMENTAL PROTECTION ACT

194. The Plaintiff repeats, realleges, and incorporates by reference each allegation contained in Paragraphs 1-180, above, as though_fully set forth herein.

195. Section 12(d) of the Act, 415 ILCS 5/12(d) (2020), provides as follows: "No person shall: (d) deposit any contaminants upon the land iii-such place and manner so as to create a water pollution hazard."

196.     Section 11 of the Act, 415 ILCS 5/11 (2020), provides, in pertinent part, as follows:

§ 11. (a) The General Assembly finds:

(l) that pollution of the waters of this State constitutes a menace to public health and welfare, creates public nuisances, is harmful to wildlife, fish, and aquatic life, impairs domestic, agricultural, industrial, recreational, and other legitimate beneficial uses of water, depresses property values, and offends the senses;

*          *          *

(c) The provisions of this Act authorizing implementation of the regulations pursuant to an NPDES program shall not be construed to limit, affect, impair, or diminish the authority, duties and responsibilities of the ·Board, Agency, Department or any other governmental agency or officer, or of any unit of local government, to regulate and control pollution of any kind, to restore, to protect or to enhance the quality of the environment, or to achieve all other purposes, or to enforce provisions, set forth in this Act or other State law or regulation.

197.     By depositing PFAS and PFAS-containing waste on the land through sludge disposal and land application, and through suspected leaks and spills of PFAS through the manufacturing process, each a "contaminant" defined by Section 3.165 of the Act, 415 ILCS 5/3.165 (2020), in a place and manner that the contaminants could be carried by storm water or other conveyance into surface waters, including but not limited to the Mississippi River, and/or into the groundwater, 3M created a water pollution hazard at and around the Cordova Facility and thereby violated Section 12(d) of the Act, 415 ILCS 5/12(d) (2020).

198.     Violations of the pertinent environmental statutes will continue until and unless this Court grants equitable relief in the form of an immediate and, after trial, permanent injunction.

**WHEREFORE**, Plaintiff, Donna Deufel, respectfully requests that this Court enter an Order:

(a) Finding that 3M violated Section 12(d) of the Act, 415 ILCS 5/12(d) (2020);

(b) Enjoining 3M from any fu11her violations of Section 12(d) of the Act, 415 ILCS 5/12(d) (2020);

(c)    Ordering that 3M take immediate, necessary action to correct the violation of Section

12(d) of the Act, 415 ILCS 5/12(d) (2020), which would include, without limitation, the investigation

and remediation of all PFAS contamination at and around the Cordova Facility;

(d)    Assessing a civil penalty exceeding Fifty Thousand Dollars ($50,000.00) against 3M

for each violation of the Act and pertinent regulations, and an additional civil penalty of Ten

Thousand Dollars ($10,000.00) for each day of violation;

(e)    Ordering 3M, pursuant to 415 ILCS 5/42(f) (2020) to pay all costs, including

oversight, sampling, and clean-up costs, and attorney, expert witness, and consultant fees expended

by the Plaintiff in its pursuit of this action; and

(f) Granting such other relief as this Court deems appropriate and just.

## COUNT III - NEGLIGENCE PER SE
## DISCHARGING WITHOUT AN NPDES PERMIT IN VIOLATION OF SECTION 12(f) OF THE ILLINOIS ENVIRONMENTAL PROTECTION ACT

199.    The Plaintiff repeats, realleges, and incorporates by reference each allegation

contained in Paragraphs 1-180, above, as though fully set forth herein.

200.    Section 12(:f) of the Act, 415 ILCS 5/12(:f) (2020), provides in pertinent part, as

follows:

> No person shall : (f) Cause, threaten or allow the discharge of any contaminant into
> the waters of the State, as defined herein, including but not limited to, waters to any
> sewage works, or into any well or from any point source within the State, without an
> NPDES permit for point source discharges issued by the Agency under Section 39(b)
> of this Act, or in violation of any tem1 or condition imposed by such pennit, or in
> violation of any NPDES permit filing requirement established under Section 39(b), or
> in violation of any regulations adopted by the Board or of any order adopted by the
> Board with respect to the NPDES program.

201.    Section 309.102(a) of the IPCB Regulations, 35 Ill. Adm. Code 309.102(a), provides

as follows: "Except as in compliance with the provisions of the Act, Board regulations, and the CWA,

and the provisions and conditions of-the NPDES permit issued to the discharger,

the discharge of any contaminant or pollutant by any person into the waters of the State from a point source or into a well shall be unlawful."

202.    By discharging PFAS that were not included in the Cordova Facility's NPDES Permit into the Mississippi River from the Outfalls listed in its NPDES Permit, 3M violated Section 309.102(a) of the IPCB Regulations, 35 Ill. Adm. Code 309.102(a).

203.    By threatening or allowing the discharge of any contaminant into the Mississippi River from point sources not authorized in the Cordova Facility's NPDES Pennit, 3M fmiher violated Section 309.102(a) of the IPCB Regulations, 35 Ill. Adm. Code 309.102(a).

204.    By violating Section 309.102(a) of the TPCB Regulations, 35 Ill. Adm. Code 309.102(a), 3M thereby violated Section 12(f) of the Act, 415 TLCS 5/12(f) (2020).

205.    Violations of the peIiinent environmental statutes will continue until and unless this Court grants equitable relief in the form of an immediate and, after trial, permanent injunction.

**WHEREFORE**, Plaintiff, Donna Deufel, respectfully requests that this Court enter an Order:

(a)    Finding that 3M violated Section 5/12(f) of the Act, 415 ILCS 5/12(f) (2020), and Section 309.102(a) of the IPCB Regulations, 35 Ill. Adm. Code 309.102(a);

(b)    Enjoining 3M from any further violations of Section 5/1 2(t) of the Act, 415 ILCS 5/12(f) (2020), and Section 309.102(a) of the IPCB Regulations, 35 Ill. Adm. Code 309.102(a);

(c)    Ordering that 3M take immediate, necessary action to correct its violations of Section 5/12(f) of the Act, 415 ILCS 5/12(f) (2020), and Section 309.102(a) of the IPCB Regulations, 35 Ill. Adm. Code 309.102(a), which would include, without limitation, the investigation and remediation of all PFAS contamination at and around the Cordova Facility;

(d)    Assessing a civil penalty of Ten Thousand Dollars ($10,000.00) against 3M for each of its violations of the Act and pertinent regulations, and an additional civil penalty of Ten Thousand Dollars ($10,000.00) for each day of violation;

(e)    Ordering 3M, pursuant to 415 ILCS 5/42(f) (2020) to pay all costs, including oversight, sampling, and clean-up costs, and attorney, expert witness, and consultant fees expended by Plaintiff in its pursuit of this action; and

(f) Granting such other and further relief as this Court deems appropriate and just.

### COUNT IV - NEGLIGENCE PER SE
### LIABILITY UNDER 415 ILCS 5/22.2(t)

206.    The Plaintiff repeats, realleges, and incorporates by reference each allegation contained in Paragraphs 1-180, above, as though fully set forth herein.

207.    Section 22.2(f) of the Act, 415 ILCS 5/22.2(f) (2020), provides that certain parties "shall be liable for all costs of removal or remedial action incurred by the State of Illinois or any unit of local government as a result of a release or substantial threat of a release of a hazardous substance or pesticide."•

208.    One party that can be held liable is "the owner and operator of a facility or vessel from which there is a release or a substantial threat of a release of a hazardous substance or pesticide." 415 ILCS 5/22.2(f)(l) (2020).

209.    "Remove" or "removal" is defined in 415 ILCS 5/3.405 (2020) as:

the cleanup or removal of released hazardous substances from the environment, actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or the environment, that may otherwise result from a release or threat of release. The tenn includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing

of threatened individuals, and any emergency assistance that may be provided under the Illinois Emergency Management Agency Act or any other law.

210. "Remedial action" is defined in 415 ILCS 5/3.400 (2020) as:

those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The tem1 includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances or contaminated materials, recycling or reuse, diversion destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term inc.ludes the costs of permanent relocation of residents and businesses and community facilities where the Governor and the Director determine that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or·secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare. The term includes offsite transport of hazardous substances, or the storage, treatment, destmction, or secure disposition offsite of such hazardous substances or contaminated materials.

211. "Release" is defined broadly as "any spilling, leaking, pumping, pouring, emitting,

emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment

... " 415 ILCS 5/3.395 (2020).

212. "Hazardous substance", as defined in 415 ILCS 5/3.215 (2020), includes hazardous wastes.

213. "Hazardous waste" is defined broadly in 415 lLCS 5/3.220 (2020).

214. The definition includes "a waste, or combination of wastes, which because of its

quantity, concentration, or physical, chemical, or infectious characteristics may cause or

significantly contribute to an increase in mortality or an increase in serious, irreversible, or

incapacitating reversible illness."

"46

215.    PFAS are hazardous wastes, as that term is broadly defined in 415 ILCS 5/3.220 (2020).

216.    Because PFAS is a "hazardous waste", as that te1m is defined in 415 ILCS 5/3.220 (2020), it is also a "hazardous substance", as that term is defined in 415 ILCS 5/3.215 (2020).

217.    The leaking, emitting, discharging, escaping, leaching, dumping and disposal of PFAS into the environment, a hazardous substance, constitutes a "release" as that term is defined in 415 ILCS 5/3.395 (2020).

218.    The Illinois EPA has established Health Advisory Levels for six PFAS compounds.

219.    As a result of the groundwater sampling conducted by 3M, US EPA, and the Illinois EPA, the State has discovered PFAS at the Cordova Facility, which has or is likely to require "removal" as that term is defined in 415 ILCS 5/3.405 (2020), and "remedial action" as that te1m is defined in 415 ILCS 5/3.400 (2020), at and around the Cordova Facility.

220.    The levels of PFAS impacting surface water, groundwater, drinking water, wetlands, soils, and sediments at and around the Cordova Facility exceed the Illinois EPA's current Health Advisory Levels and proposed groundwater quality standards.

221.    Considering PFAS' chemical characteristics, fate in the. environment, dose response, toxicity, and adverse impacts on natural resources, the concentrations and quantities of PFAS in surface water, groundwater, drinking water, wetlands, soil, and sediments at and around the Cordova Facility may cause or significantly contribute to an increase in mortality or an increase in serious, irreversible, or incapacitating reversible, illness and pose an unacceptable risk of substantial danger to present or future public health or welfare or the environment.

222.    As a result of releases and substantial threats of a release of a hazardous substance, the State has incurred and is continuing to incur removal and remedial costs at and around the Cordova Facility, including investigation, monitoring, and enforcement costs.

**WHEREFORE**, Plaintiff, Donna Deufel, respectfully requests that this Court enter an Order:

(a)    Finding that 3M violated Section 22.2(f) of the Act, 415 ILCS 5/22.2(f) (2020);

(b)    Ordering 3M to compensate the State for all past and future natural resource damages, loss-of use damages, response activity costs, costs of investigation, costs of testing and monitoring, costs of providing water from an alternate source, costs of installing and maintaining an early warning system to detect PFAS contamination before it reaches wells, costs of remediating PFAS and other hazardous substances from natural resources at and around the Cordova Facility including groundwater, surface waters, soils, sediments, and other natural resources, costs of remediating PFAS and hazardous substance contamination at and around the Cordova Facility, any other costs or other expenditures incurred to address PFAS contamination and injury at and around the Cordova Facility, and interest on the damages according to law;

(c)    Assessing a civil penalty exceeding Fifty Thousand Dollars ($50,000.00) against 3M for each of its violation of the Act and pertinent regulations, and an additional civil penalty of Ten Thousand Dollars ($10,000.00) for each day of violation;

(d) Ordering 3M to pay all applicable civil fines; and

(e) Granting such other and further relief as this Court deems appropriate and just.

## COUNTY V - NEGLIGENCE PER SE
### AIR POLLUTION UNDER SECTION 9(a) OF THE ILLINOIS ENVIRONMENTAL PROTECTION ACT

223.    The Plaintiff repeats, realleges, and incorporates by reference each allegation contained in Paragraphs 1-180, above, as though fully set forth herein.

224.    Section 9(a) of the Act, 415 ILCS 5/9(a) (2020), provides as follows:

No person shall:

a. Cause or threaten or allow the discharge or emission of any contaminant into the environment in any State so as to cause or tend to cause air pollution in Illinois, either alone or in combination with contaminants from other sources, or so as to violate regulations or standards adopted by the Board under this Act;

225. Section 201.141 of the Illinois Pollution Control Board ("Board") Air Pollution Regulations, 35 Ill. Adm. Code 201.141 provides as follows:

No person shall cause or threaten or allow the discharge or em1ss1011 of any contaminant into the environment in any State so as, either alone or in combination with contaminants from other sources, to cause or tend to cause air pollution in Illinois, or so as to violate the provisions of this Chapter, or so as to prevent the attainment or maintenance of any applicable ambient air quality standard.

226. Section 3.165 of the Act, 415 ILCS 5/3.165 (2020), contains the following definition:

"CONTAMINANT" is any solid, liquid, or gaseous matter, any odor or any fom1 of energy, from whatever source.

227. PFAS compounds are each a "contaminant" as the te1m is defined in Section 3.165 of the Act, 415 ILCS 5/3.165 (2020).

228. Section 3.115 of the Act, 415 ILCS 5/3.115 (2020), provides the following definition:

"Air pollution" is the presence in the atmosphere of one or more contaminants in sufficient quantities and of such characteristics and duration as to be injurious to human, plant, or animal life, to health, or to prope1iy, or to unreasonably interfere with the enjoyment of life or property.

229. The production of PFAS results in air emmissions from PFAS manufacturing facilities, such as 3M's PFAS production at the Cordova Facility.

230. The emission of PFAS resulting from the manufacture of PFAS compounds and other products that are produced from PFAS compounds at the Cordova Facility, which injured and continue to injure human, plant, aquatic, and/or animal life, and human, plant, aquatic, and/or animal health, or which have unreasonably interfered and continue to interfere with the enjoyment

of life or property, constitutes air pollution, as defined in Section 3.115 of the Act, 415 ILCS 5/3.115 (2020).

231.    Defendant 3M, by its actions as alleged herein, has violated Section 9(a) of the Act, 415 ILCS 5/9(a) (2020), and Section 201.141 of the Board Regulations, 35 Ill. Adm. Code 201.141.

232.    Violations of the pertinent environmental statutes and regulations will continue until and unless this Court grants equitable relief in the folm of an immediate and, after trial, permanent injunction.

**WHEREFORE**, Plaintiff, Donna Deufel, respectfully requests that this Court enter an Order:

(a) Finding that 3M violated Section 9(a) of the Act, 415 ILCS 5/9(a) (2020), and Section 201.141 of the Board Regulations, 35 Ill. Adm. Code 201.141;

(b)    Enjoining 3M from committing any further violations of Section 9(a) of the Act, 415 ILCS 5/9(a) (2020), and Section 201.141 of the Board Regulations, 35 Ill. Adm. Code 201.141;

(c)    Ordering that 3M take immediate, necessary action to correct its violations of Section 9(a) of the Act, 415 ILCS 5/9(a) (2020), and Section 201.141 of the Board Regulations, 35 Ill. Adm. Code 201.141, which would include, without limitation, the investigation and remediation of all PFAS contamination at and around the Cordova Facility;

(d)    Assessing a civil penalty exceeding Fifty Thousand Dollars ($50,000.00) against 3M for each of its violation of the Act and pertinent regulations, and an additional civil penalty of Ten Thousand Dollars ($10,000.00) for each day of violation;

(e)    Ordering 3M, pursuant to 415 ILCS 5/42(t) (2020) to pay all costs, including

oversight, sampling, and clean-up costs, and attorney, expert witness, and consultant fees

expended by the Plaintiff in its pursuit of this action; and

(f) Granting such other and further relief as this Court deems appropriate and just.

## COUNT VI - NEGLIGENCE PER SE
## RESTORATION OF AQUATIC LIFE AND WILDLIFE
## UNDER THE FISH AND WILDLIFE CODES

233.    The Plaintiff repeats, realleges, and incorporates by reference each allegation

contained in Paragraphs 1-180, above, as though fully set forth herein.

234.    Section 1-130 of the Fish Code, 515 ILCS 5/1-130 (2020), provides as follows:

Cooperation with EPA. The Department is authorized to cooperate with the
Environmental Protection Agency of the State of Illinois in making pollution
investigations and reports pollution investigations.

235.    Section 1.5 of the Wildlife Code, 520 ILCS 5/1.5 (2020), provides as follows:

The Department is authorized to cooperate with the Environmental Protection
Agency of the State of Illinois in making pollution investigations and making
reports thereof.

236.    Section 1.50 of the Fish Code, 515 ILCS 5/1-150 (2020), provides, in

pertinentpa1i, as follows:

Preservation of aquatic life; actions to enforce Code. The Department shall take
all measures necessary for the conservation, distribution, introduction, and
restoration of aquatic life. * _* * The Department shall also bring or cause to be
brought actions and proceedings, in the name and by the authority of the People of
the State of Illinois, to enforce this Code, including administrative rules, and to
recover any and all fines and penalties provided for. * : *

237.    Section 1.20 of the Fish Code, 515 ILCS 5/1-20 (2020), provides in pertinent pati,

**the following definition:**

"Aquatic life" means all fish, mollusks, crustaceans, algae, aquatic plants, aquatic
invertebrates, and any other aquatic animals or plants that the Department
identifies in rules adopted after consultation with biologists, zoologists, or other
wildlife **experts.** * * *

238. Section 5-5 of the Fish Code, 515 ILCS 5/5-5 (2020), provides, in pertinent part,

as follows:

> If any person causes any waste, sewage, thermal effluent, or any other pollutant to enter into, or causes or allows pollution of, any waters of this State so as to kill aquatic life, the Department, through the Attorney General, may bring an action against that person and recover the value of and the related costs in determining the value of the aquatic life destroyed by the waste, sewage, them1al effluent, or pollution. Any money so recovered shall be placed into the Wildlife and Fish Fund in the State Treasury.

239. Section 1-70 of the Fish Code, 515 ILCS 5/1-70 (2020), provides the following

definition:

> "Person" includes the plural "persons", females as well as males, and shall extend and be applied to clubs, associations, corporations, firms; and partnerships as well as individuals.

240. 3M, a corporation, is a "person" as that term is defined in Section 1-70 of the

Code, 515 ILCS 5/1-70 (2020).

241. Section 1-10 of the Wildlife Code, 520·ILCS 5/1-10 (2020), provides, in pertinent

part, as follows:

> The Department shall take all measures necessary for the conservation, distribution, introduction and restoration or birds and mammals. The Department also shall bring or cause to be brought, actions and proceedings, in the name, and by the authority, of the People of the State of Illinois, to enforce the provisions of this Act, including administrative rules, and to recover any and all fines and penalties hereinafter provided for. * * *

242. By causing or allowing the release of PFAS from the Cordova Facility, 3M

adversely affected the aquatic life, wildlife, habitat, and natural resources of the Mississippi River

corridor and its watershed system at and around the Cordova Facility ("Mississippi River

System").

243. As a result of its conduct as alleged herein, 3M is thus liable for the value of the adverse impact on aquatic life and the related costs in determining the value of the aquatic life adversely impacted by the release of PFAS, pursuant to Section 5-5 of the Fish Code, 515 ILCS 5/5-5 (2020).

244. Pursuant to Section 1-150 of the Fish Code, 515 ILCS 5/1-150 (2020), and Section 1.10 of the Wildlife Code, 520 ILCS 5/1-10 (2020), 3M is also liable for the restoration of the aquatic life in and the wildlife dependent upon the Mississippi River System at and around the Cordova Facility.

**WHEREFORE**, Plaintiff, Donna Deufel, respectfully requests that this Court enter an Order:

(a)     Finding that 3M has caused the death and destruction of aquatic life in the Mississippi River System at and around the Cordova Facility, has adversely affected the aquatic life and natural resources present in the Mississippi River System at and around the Cordova Facility, and has adversely affected the wildlife dependent upon the Mississippi River system at and around the Cordova Facility;

(b)     Ordering 3M to pay the Illinois Department of Natural Resources to conduct an assessment of injury and damage determination relative to restoring the aquatic life, wildlife, habitat, and other natural resources lost or destroyed in the Mississippi River System at and around the Cordova Facility and to compensate the Illinois Depmiment of Natural Resources for injury and damage to aquatic life, wildlife, habitat, and other natural resources lost or destroyed in the Mississippi River System at and around the Cordova Facility pursuant to Section 1-150 of the Fish Code, 515 ILCS 5/1-150 (2020), and Section 1-10 of the Wildlife Code, 520 ILCS 5/1-10 (2020);

(c)     Assessing a civil penalty exceeding Fifty Thousand Dollars ($50,000.00) against 3M for each of its violation of the Act and pertinent regulations, and an additional civil penalty of

Ten Thousand Dollars ($10,000.00) for each day of violation; and

(d) Granting such other and further relief as this comi deems appropriate and just.

## COUNT VII
## NEGLIGENCE

245. The Plaintiff repeats, realleges, and incorporates by reference each allegation contained in Paragraphs 1-180, above, as though fully set forth herein.

246. 3M had a duty to the State to exercise due care in the manufacture, disposal, discharge, and emission of PFAS, waste containing PFAS, and products containing PFAS.

247. 3M breached its duty of care in that it negligently, carelessly, and/or recklessly. manufactured and disposed of, discharged and emitted PFAS at and around the Cordova Facility. 3M directly and proximately caused PFAS to contaminate the property under the jurisdiction of the State and its surface waters, groundwater, drinking water, wetlands, aquatic life, wildlife, marine resources, soil, sediment, and other natural resources, thereby causing a threat to human health and the environment, despite its years-long knowledge that PFAS chemicals persist in the environment and are harmful to human health and the environment.

248. As a direct and proximate result of 3M's acts and omissions as alleged herein, the State has suffered monetary losses and damages in amounts to be proven at trial.

**WHEREFORE**, Plaintiff, Donna Deufel, respectfully requests that this Court enter an Order:

(a) Finding that 3M's actions alleged herein constituted, and continue to constitute, negligent acts;

(b) Holding 3M liable for all past and future natural resource damages, loss-of use damages, response activity costs, costs of investigation, costs of testing and monitoring, costs of providing water from an alternate source, costs of installing and maintaining an early warning system to detect PFAS before it reaches wells, costs of remediating PFAS from natural resources

COPY

at and around the Cordova Facility including groundwater, surface waters, soils, sediments, and other natural resources, costs of remediating PFAS contamination at and around the Cordova Facility, any other costs or other expenditures incurred to address PFAS contamination and injury at and around the Cordova Facility, interest on the damages according to law, any applicable civil penalties, and any other relief necessary to remedy PFAS contamination at and around the Cordova Facility;

(c)     Ordering 3M to immediately undertake the necessary action that will result in a final and permanent abatement of the damage caused by its negligent acts, which would include, without limitation, the investigation and remediation of all PFAS contamination at and around the Cordova Facility;

(d)     Assessing a civil penalty exceeding Fifty Thousand Dollars ($50,000.00) against 3M for each of its violation of the Act and pertinent regulations, and an additional civil penalty of Ten Thousand Dollars ($10,000.00) for each day of violation;

(e)     Ordering 3M to pay all costs, including oversight, sampling, assessment, restoration, and clean-up costs, and attorney, expert witness, and consultant fees expended by Plaintiff in its pursuit of this action; and

(f) Granting such other and further relief as this Court deems appropriate and just.

## COUNT VIII
### TRESPASS

249.    The Plaintiff repeats, realleges, and incorporates by reference each allegation contained in Paragraphs 1-180, above, as though fully set forth herein.

250.    The PFAS manufactured, disposed of, discharged, and emitted by 3M affecting the State's property and its surface waters, groundwater, drinking water, wetlands, aquatic life, wildlife, marine resources, soil, sediment, and other natural resources constitutes an unauthorized direct and immediate physical intrusion of property of which the State is a trustee.

251. The trespass of PFAS alleged herein has varied over time and has not ceased.

252. PFAS that 3M disposed of, discharged, emitted, released, and/or otherwise handled, supplied, and/or used continues to be located on or in the State's property and its surface water, groundwater, drinking water, wetlands, aquatic life, wildlife, marine resources, soil, sediment, and other natural resources.

253. 3M knew with substantial certainty that its acts would contaminate the State's property and its surface waters, groundwater, drinking water, wetlands, aquatic life, wildlife, marine resources, soil, sediment, and other natural resources.

254.   3M is liable for trespass.

255.   The Plaintiff has not consented to and does not consent to the trespass alleged herein.

256. Accordingly, the Plaintiff is bringing this action for the invasion of its exclusive possessory interests in the State's natural resources, in addition to its interest in the integrity of the State's natural resources.

257.   As long as property and natural resources under the jurisdiction of the State remain contaminated due to 3M's conduct, the trespass continues.

258. As a direct and proximate result of 3M's acts and omissions as alleged herein, the Plaintiff has suffered monetary losses and damages in an amount to be proven at trial.

**WHEREFORE**, Plaintiff, Donna Deufel, respectfully requests that this Court enter an Order:

(a)   Finding that 3M's actions alleged herein constituted, and continue to constitute, a trespass;

(b) Holding 3M liable for all past and future natural resource damages, loss-of use

damages, response activity costs, costs of investigation, costs of testing and monitoring, costs of

providing water from an alternate source, costs of installing and maintaining an early warning system

to detect PFAS before it reaches wells, costs of remediating PFAS from natural resources including

groundwater, surface waters, soils, sediments, and other natural resources, costs of remediating PFAS

contamination at and around the Cordova Facility, any other costs or other expenditures incurred to

address PFAS contamination and injury at and around the Cordova Facility, interest on the damages

according to law, any applicable civil penalties, and any other relief necessary to remedy PFAS

contamination at and around the Cordova Facility;

(c) Ordering 3M to immediately undertake the necessary action that will result in a final

and permanent abatement of the trespass, which would include, without limitation, • the investigation

and remediation of all PFAS contamination at and around the Cordova Facility;

(d) Assessing a civil penalty exceeding Fifty Thousand Dollars ($50,000.00) against 3M

for each of its violation of the Act and pertinent regulations, and an additional civil penalty of Ten

Thousand Dollars ($10,000.00) for each day of violation;

(e) Ordering 3M to pay all costs, including oversight, sampling, assessment. restoration.,

and clean-up costs, and attorney, expert witness, and consultant fees expended by Plaintiff in its

pursuit of this action; and

(f) Granting such other and further relief as this Court deems appropriate and just.

## COUNT IX
## COMMON LAW PUBLIC NUISANCE

259. The Plaintiff repeats, realleges, and incorporates by reference each allegation contained

in Paragraphs 1-180, above, as though fully set forth herein.

260. The Illinois Constitution provides the People of the State of Illinois a common right to

COPY

a healthful environment. Ill. Const. art XI, sec. I (1970).

261.　3M, by its actions, caused an unreasonable and substantial prejudice to the public health and welfare and the environment. To wit, by its conduct, alleged herein, 3M has, through

its actions, manufactured, disposed of, discharged, and emitted PFAS in a way that has the caused the pollution of the surface water, groundwater, drinking water, wetlands soils, and sediments at and around the Cordova Facility including, but not limited to the Mississippi River System.

262. These actions have thereby threatened harm to area residents and interfered with their use and enjoyment of the environment and their homes and other propel iies.

263. As a consequence of 3M's actions as alleged herein, 3M has created and maintained, and continues to create and maintain, a public nuisance at common law.

**WHEREFORE**, Plaintiff, Donna Deufel, respectfully requests that this Court enter an Order:

(a) Finding that 3M's actions alleged herein constituted a common law public nuisance;

(b) Enjoining 3M from further acts constituting a common law public nuisance;

(c) Ordering 3M to immediately undertake the necessary action that will result in a final and permanent abatement of the common law public nuisance, which would include, without limitation, the investigation and remediation of all PFAS contamination at and around the Cordova Facility and assessment and restoration of impacted natural resources;

(d) Assessing a civil penalty exceeding Fifty Thousand Dollars ($50,000.00) against 3M for each of its violation of the Act and pertinent regulations, and an additional civil penalty of Ten Thousand Dollars ($10,000.00) for each day of violation;

(e) Ordering 3M to pay all costs, including oversight, sampling, assessment, restoration, and clean-up costs, and attorney, expert witness, and consultant fees expended by Plaintiff in its pursuit of this action; and

(f) Granting such other and familiar relief as this Court deems appropriate and just.

COPY

## COUNT X
## COMMON LAW PROHIBITION ON UNJUST ENRICHMENT

264. The Plaintiff repeats, realleges, and incorporates by reference each allegation contained in Paragraphs 1-180, above, as though fully set forth herein.

265. 3M has knowingly and unjustly retained a benefit to the Plaintiff's detriment.

266. 3M's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.

267. By continuing to manufacture and dispose of, discharge, and emit PFAS contaminated water, waste, and air emissions, despite the fact that 3M was aware that PFAS was hazardous to human health and the environment, 3M has unjustly enriched itself at the Plaintiff's expense.

268. Because of 3M's failure to make the plaintiff aware of the harmful nature of PFAS, and 3M's manufacture and disposal of PFAS at the Cordova Facility, 3M obtained enrichment it would not have otherwise obtained.

269. The enrichment was without justification and the plaintiff lacks a remedy provided by law.

270. Unjust enrichment arises not only where an expenditure by one party adds to the property of another, but also where the expenditure saves the other from expense or loss.

271. To address PFAS contamination and the related property damage and personal injury the Plaintiff has incurred, and continues to incur, substantial costs in treating illnesses, due to PFAS contamination at and from the Cordova Facility.

COPY

272.    3M has received a benefit from the State's response activities because 3M should bear the cost of investigating and cleaning up the PFAS contamination caused by or related to the manufacture, use, and disposal, discharge, and emission of PFAS and PFAS-containing products at the Cordova Facility.

273.    3M's misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort that the Plaintiff would reasonably expect to occur and is not part of the normal and expected costs of the Plaintiff's existence. The Plaintiff alleges wrongful acts which are neither discrete nor of the sort that can reasonably be expected.

274.    The principles of justice and established common law require 3M to reimburse the State for performing a duty properly owed by 3M as a result of its conduct, as alleged herein.

**WHEREFORE**, Plaintiff, Donna Deufel, respectfully requests that this Court enter an Order:

(a)    Awarding compensatory damages in an amount sufficient to fairly and completely compensate the plaintiff for all damages;

(b)    Assessing a civil penalty exceeding Fifty Thousand Dollars ($50,000.00) against 3M for each of its violation of the Act and pertinent regulations, and an additional civil penalty of Ten Thousand Dollars ($10,000.00) for each day of violation;

(c)    Awarding disgorgement or compensation for 3M's unjust enrichment of profits which directly result from the wrongful acts described above;

(d)    Entering a declaratory judgment requiring 3M to abate the statutory violations alleged above, trespass, and public nuisance caused by the PFAS contamination; and

(e)    Granting such other and further relief as this Court deems appropriate and just.

## COUNT XI

### Personal Injury to Plaintiff

275. Plaintiff restates, realleges, and incorporates by reference each allegation contained in Paragraphs 1-180, above.

276. Exposure to PFAS significantly increase the risk of colon cancer.

277. Plaintiff developed Moderately Differentiated Adenocarcinoma of the Sigmoid Colon that was discovered in 2022.

278. Plaintiff underwent a exploratory laparotomy with a sigmoidectomy and low anterior resection for perforated rectal cancer and feculent peritonitis in July of 2022.

279. Plaintiff underwent numerous follow-up surgeries for colostomy revision, port placement, and hernia repairs to name a few.

280. Plaintiff underwent months of chemotherapy.

281. Plaintiff has suffered significant financial harm from the colon cancer treatment.

282. Plaintiff has suffered significant emotional harm.

284. Plaintiff has struggled to maintain a healthy body image since the treatment of her colon cancer.

284. This battle to maintain a healthy body image has impacted all aspects of her life.

## COUNT XII

### Loss Of Use and Enjoyment of Properties As Well As Diminution In Value of Property Values

285. Plaintiff restates, realleges, and incorporates by reference each allegation contained in Paragraphs 1-284, above.

286. 21313 River road north Cordova, Il is owned by the plaintiff.

287. This property has tested positive for PFAS in the well.

288. This property also has diminished in value since this was discovered.

289. The issues with the PFAS contamination must be disclosed when attempting to sell the property.

290. Banks will not finance a property with environmental contamination until it can be proven that the contamination has been remediated.

291. This substantially limits the ability to sell either of the above property.

**WHEREFORE**, Plaintiff, Donna Deufel, respectfully requests that this Court enter an Order:

(a) Awarding compensatory damages in an amount sufficient to fairly and completely compensate the plaintiff for all damages in an amount exceeding $50,000;

(b) Granting such other and further relief as this Court deems appropriate and just.

### REQUEST FOR RELIEF

**WHEREFORE**, in addition to the relief requested in each individual Cause of Action listed above, Plaintiff, Donna Deufel, seeks judgment in its favor and against 3M for:

    A. Compensatory damages arising from PFAS contamination and injury of natural resources and property under the jurisdiction of the State, including groundwater, surface waters, wetlands, drinking water supplies, biota, wildlife, aquatic life, and their associated soils, sediments, and uses, and other State natural resources and property, according to proof, including, but not limited to:

(i)    natural resource damages;

(ii)   loss-of use damages;

(iii)  past and future response activity costs;

(iv)   costs of investigation;

(v)    costs of testing and monitoring;

(vi)   costs of providing water from an alternate source;

(vii)  costs of installing and maintaining approved drinking water treatment systems;

(viii) costs of installing and maintaining an early warning system to detect PFAS before it reaches wells;

(ix)   costs of remediating PFAS from natural resources and restoration of these natural resources, including groundwater, surface waters, wetlands, soils, sediments, and other natural resources;

(x)    remedial action at and around the Cordova Facility, including cleanup of PFAS contamination;

(xi) any other costs or other expenditures incurred to address PFAS contamination and injury at and around the Cordova Facility; and

(xii) interest on the damages according to law;

B. Injunctive relief to address past, present, and future PFAS contamination by:

    a. ordering 3M to implement a program of ongoing public outreach and information-sharing efforts to provide effective communication to the public and local units of government regarding the status and progress of response activities related to 3M's releases of PFAS into the environment;

    b. ordering 3M to institute protective measures to prevent endangerment to human health and the environment including,. but not limited to: (a) sampling for PFAS in drinking water using U.S. EPA-approved Method 537 version 1.1, as written, including any modifications allowed therein, or any subsequent U.S. EPA approved method; (b) connection to municipal drinking water supplies; and (c) provision and maintenance of drinking water treatment systems, including regular sampling; and

    c. ordering 3M to complete the investigation, characterization, and remediation of the PFAS released into the environment from its manufacturing processes and disposal practices, identify pathways of exposure to natural resources, restore natural resources that have been damaged or impacted by PFAS, and analyze the impact of PFAS on drinking water wells, surface waters, stream biota, groundwater, soils, sediments, flora, and fauna, including sportfish and other wildlife consumed by the public, subject to the approval of the State;

4:24-cv-04174-JEH   # 1-1   Filed: 09/26/24   Page 77 of 77
4:22-cv-04075-SLD-JEH   # 1-1   64 of
NUMPAGES
69

C. Statutory penalties, fines, and any other relief available under the Illinois Environmental
   Protection Act;

D. Costs (including reasonable attorney fees, court costs, and other expenses of litigation);

E. Prejudgment interest; and

F. Any other and further relief as the Court deems just, proper, and equitable.



Donna Deufel, Plaintiff


By: _____

Jeffrey J. Neppl
The Neppl Law Group
622 19th St.
Moline, Illinois 61265
Ph – 309.524.7911
Fx – 309.524.7916
Email: jeffrey@theneppllawcentre.com
ATTORNEY FOR PLAINTIFF

COPY